Opinion by Judge IKUTA; Dissent by Chief Judge KOZINSKI.
OPINION
IKUTA, Circuit Judge:
Proposition 200 requires prospective voters in Arizona to present documentary proof of citizenship in order to register to vote, Ariz.Rev.Stat. §§ 16-152,16-166, and requires registered voters to present proof of identification in order to cast a ballot at the polls, Ariz.Rev.Stat. § 16-579. This appeal raises the questions whether Proposition 200 violates the Voting Rights Act § 2, 42 U.S.C. § 1973, is unconstitutional under the Fourteenth or Twenty-fourth Amendments of the Constitution, or is void as inconsistent with the National Voter *1169 Registration Act (NVRA), 42 U.S.C. § 1973gg et seq. We hold that the NVRA supersedes Proposition 200’s voter registration procedures, and that Arizona’s documentary proof of citizenship requirement for registration is therefore invalid. We reject the remainder of Appellants’ arguments.
I
On November 2, 2004, Arizona voters passed a state initiative, Proposition 200, which (upon proclamation of the Governor) enacted various revisions to the state’s election laws. Among other changes, Proposition 200 amended the procedures for voter registration and for checking voters’ identification at polling places in both state and federal elections. With respect to voter registration procedures, Proposition 200 amended two state statutes. First, it added the following requirement to section 16-152 of the Arizona Revised Statutes, which lists the contents of the state voter registration form:
The form used for the registration of electors shall contain ... [a] statement that the applicant shall submit evidence of United States citizenship with the application and that the registrar shall reject the application if no evidence of citizenship is attached.
Ariz.Rev.Stat. § 16-152(A)(23). Second, it amended section 16-166 of the Arizona Revised Statutes to state that: “The County Recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship,” and defined satisfactory evidence of citizenship to include a driver’s license or similar identification license issued by a motor vehicle agency, a birth certificate, passport, naturalization documents or other specified immigration documents, or specified cards relating to Native American tribal status. See Ariz.Rev.Stat. § 16-166(F).[1]
Proposition 200 also addressed identification procedures at polling places. Specifically, Proposition 200 amended section 16-579 of the Arizona Revised Statutes to provide that voters “shall present one form of identification that bears the name, address and photograph of the elector or two different forms of identification that bear the name and address of the elector.” Ariz.Rev.Stat. § 16-579(A) (2004). The Secretary of State, acting under statutory authority, see Ariz.Rev.Stat. § 16-452(A), (B), promulgated a procedure specifying *1170 the “forms of identification” accepted under the statute, which included photograph-bearing documents such as driver’s licenses and non-photograph-bearing documents such as utility bills or bank statements. In 2009, the state legislature amended section 16-579 to codify that procedure.[2]
Shortly after Proposition 200’s passage, various plaintiffs filed a complaint against Arizona to prevent the implementation of these changes. Two groups of plaintiffs are relevant to this appeal. Jesus Gonzalez, representing individual Arizona residents and organizational plaintiffs, claimed that Proposition 200 violated the NVRA (to the extent the Arizona enactment regulated federal registration procedures), was a poll tax under the Twenty-fourth Amendment, burdened naturalized citizens in violation of the Equal Protection Clause of the Fourteenth Amendment, and disparately impacted Latino voters and diluted Latino voting power in violation of § 2 of the Voting Rights Act. The Inter Tribal Council of Arizona (ITCA), a non-profit organization representing twenty Arizona tribes, filed a complaint along with various other organizations,[3] the Hopi Tribe, and Representative Steve Gallardo from the Arizona State House of Representatives.[4] Like Gonzalez, ITCA claimed that Proposition 200 violated the NVRA (to the extent it regulated federal registration procedures), and constituted a poll tax under the Twenty-fourth Amendment. ITCA also separately claimed that Proposition 200 was a poll tax under the Fourteenth Amendment. The district court consolidated Gonzalez and ITCA’s complaints.
Gonzalez and ITCA moved for a preliminary injunction to enjoin application of *1171 Proposition 200’s requirements in the 2006 general election, Gonzalez v. Arizona (Gonzalez I), 485 F.3d 1041, 1047 (9th Cir.2007). The district court denied their motion, but a motions panel of this court reversed and granted the injunction pending disposition of the merits on appeal. Id. The Supreme Court vacated the injunction, and remanded for clarification whether this court had given due deference to the district court’s findings of fact. Id. at 1048; see Purcell v. Gonzalez, 549 U.S. 1, 5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). On remand, Gonzalez and ITCA chose to pursue injunctive relief with respect only to Proposition 200’s registration requirement. Gonzalez I, 485 F.3d at 1048. The Gonzalez I panel thereafter affirmed the district court’s denial of the preliminary injunction, holding that Proposition 200’s registration requirement was not a poll tax, id. at 1049, and was not a violation of the NVRA, id. at 1050-51. The district court subsequently granted Arizona’s motion for summary judgment, relying on Gonzalez I to rule that Proposition 200 was not an unconstitutional poll tax and was not invalid as conflicting with the NVRA. After trial, the district court resolved all other claims in favor of Arizona, holding that Proposition 200 did not violate § 2 of the Voting Rights Act and did not discriminate against naturalized citizens or burden the fundamental right to vote in violation of the Fourteenth Amendment’s Equal Protection Clause.
On appeal, Gonzalez and ITCA challenge the district court’s rulings on the NVRA and the Twenty-fourth Amendment. In addition, ITCA claims that Proposition 200 is an invalid poll tax under the Fourteenth Amendment, and Gonzalez challenges the district court’s decisions on both the Voting Rights Act claim and the equal protection challenge for discrimination based on national origin and undue burden on the fundamental right to vote. We consider each of these claims in turn.
II
We begin with Gonzalez’s claim that Proposition 200’s documentary proof of citizenship requirement for registration is superseded by the NVRA’s comprehensive procedure for registering voters in federal elections. Gonzalez argues that the NVRA preempts Arizona law under both the Supremacy Clause and the Elections Clause of the U.S. Constitution. In response, Arizona relies on the Supremacy Clause’s “presumption against preemption,” Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), to argue that the NVRA did not expressly or impliedly preempt state voter registration laws. Before addressing the parties’ arguments, we first consider whether the framework of the Elections Clause or the Supremacy Clause guides our analysis here.
A
The Elections Clause establishes a unique relationship between the state and federal governments. It provides:
The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time by Law make or alter such Regulations, except as to the Place of chusing Senators.
U.S. Const, art. I, § 4, cl. 1. In a nutshell, the Elections Clause gives state governments initial responsibility to regulate the mechanics of national elections, “but only so far as Congress declines to preempt state legislative choices.” Foster v. Love, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997).
The history of the Elections Clause reveals the reasoning behind this unusual delegation of power. Under the Articles of Confederation, the states had full au *1172 thority to maintain, appoint, or recall congressional delegates.[5] At the Philadelphia Convention, delegates expressed concern that, if left unfettered, states could use this power to frustrate the creation of the national government, most obviously by neglecting to hold federal elections.[6] The Framers decided that Congress should be given the authority to oversee the states’ procedures related to national elections as a safeguard against potential state abuse. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 808-09, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995); see also The Federalist No. 59 (Alexander Hamilton) (Ron P. Fairfield 1981 ed., 2d ed.) (explaining that “[njothing can be more evident, than that an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy”). Over the protest of some Southern delegates,[7] the Framers approved language giving Congress power to “make or alter” the states’ regulations. See 5 Elliot’s Debates 401-02 (statement of James Madison). As subsequently modified to give Congress supervisory power, this language became the Elections Clause.[8]
As indicated by this historical context, the Elections Clause empowers both the federal and state governments to enact laws governing the mechanics of federal elections. By its plain language, the Clause delegates default authority to the states to prescribe the “Times, Places, and Manner” of conducting national elections in the first instance. U.S. Const, art. I, § 4, cl. 1. The states would not possess this authority but for the Clause: As the Supreme Court has noted, the authority to regulate national elections “aris[es] from the Constitution itself,” and is therefore “not a reserved power of the States.” U.S. Term Limits, 514 U.S. at 805, 115 S.Ct. 1842. Because federal elections did not come into being until the federal government was formed, individual states have no inherent or preexisting authority over this domain. See id. at 804-05, 115 S.Ct. 1842.
While the states have default responsibility over the mechanics of federal elections, because Congress “may at any time by Law make or alter such Regulations” passed by the state, U.S. Const, art. I, § 4, cl. 1, power over federal election procedures has been described by the Su *1173 preme Court as ultimately “committed to the exclusive control of Congress.” Colegrove v. Green, 328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).[9] Accordingly, “the power of Congress over the subject is paramount. It may be exercised as and when Congress sees fit to exercise it. When exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them.” Ex Parte Siebold, 100 U.S. 371, 384, 25 L.Ed. 717 (1879); see also Foster, 522 U.S. at 69, 118 S.Ct. 464.
Not only does the Elections Clause grant Congress authority to supersede state election laws, but we have interpreted the Clause to require states to affirmatively implement Congress’s superseding regulations, without compensation from the federal government. Voting Rights Coalition v. Wilson, 60 F.3d 1411, 1415 (9th Cir.1995). Put another way, the Elections Clause gives Congress the power to “conscript state agencies to carry out [federal] voter” procedures in accordance with Congress’s own mandates. Id. This makes the Clause unique among virtually all other provisions in the Constitution, which “mostly tell [states] not what they must do but what they can or cannot do.” ACORN v. Edgar, 56 F.3d 791, 794 (7th Cir.1995).
In sum, a state’s role in the creation and implementation of federal election procedures under the Elections Clause is to administer the elections through its own procedures until Congress deems otherwise; if and when Congress acts, the states are obligated to conform to and carry out whatever procedures Congress requires. See Foster, 522 U.S. at 69, 118 S.Ct. 464.
As should be clear from this overview, the Elections Clause operates quite differently from the Supremacy Clause. The Supremacy Clause provides that the law of the United States “shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. “The primary function of the Supremacy Clause is to define the relationship between state and federal law. It is essentially a power conferring provision, one that allocates authority between the national and state governments.” White Mountain Apache Tribe v. Williams, 810 F.2d 844, 848 (9th Cir.1985).
In our system of dual sovereignty, when deciding under the Supremacy Clause whether a particular state law is preempted by a federal enactment, courts strive to maintain the “delicate balance” between the States and the Federal Government. Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); see Medtronic, 518 U.S. at 485,116 S.Ct. 2240. Courts thus endeavor to preserve the states’ authority when possible, see Gregory, 501 U.S. at 460, 111 S.Ct. 2395, particularly where a congressional enactment threatens to preempt a state law regulating matters of its residents’ *1174 health and safety, an area to which “[sjtates traditionally have had great latitude ... to legislate” as a matter of local concern, Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). See also Altria Group, Inc. v. Good, — U.S. -, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008); Medtronic, 518 U.S. at 485, 116 S.Ct. 2240. Only where no reconciliation between state and federal enactments may be reached do courts hold that Congress’s enactments must prevail, e.g., Altria, 129 S.Ct. at 543, with the understanding, however, that “the individual States ... retain[their] independent and uncontrollable authority ... to any extent” that Congress has not interfered, see The Federalist No. 33 (Alexander Hamilton).
In light of the different history and purpose of these constitutional provisions, it is not surprising that the preemption analysis for the Supremacy Clause differs from that of the Elections Clause. In its Supremacy Clause jurisprudence, the Supreme Court has crafted special guidelines to assist courts in striking the correct balance between federal and state power. First, in examining claims that a federal law preempts a state statute through the Supremacy Clause, the Supreme Court instructs courts to begin with a “presumption against preemption.” E.g., Altria Group, 129 S.Ct. at 543; Medtronic, 518 U.S. at 485, 116 S.Ct. 2240. This principle applies because, as the Court has recently noted, “respect for the States as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt state-law causes of action.” Wyeth v. Levine, — U.S.-, 129 S.Ct. 1187, 1195 n. 3, 173 L.Ed.2d 51 (2009) (internal quotation marks omitted). Second, the Court has adopted a “plain statement rule,” holding that a federal statute preempts a state statute only when it is the “clear and manifest purpose of Congress” to do so. Gregory, 501 U.S. at 461, 111 S.Ct. 2395 (internal quotation marks omitted); see also Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (“Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by ... Federal Act, unless that is the clear and manifest purpose of Congress.”) (internal quotation marks and brackets omitted). Like the presumption against preemption, this rule “is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.” Gregory, 501 U.S. at 461, 111 S.Ct. 2395.
This jurisprudence, which is motivated in large part by federalism concerns, is unsuited to analyzing the preemptive effect of a congressional enactment under the Elections Clause. Because the states’ sole power over national election procedures is that delegated by the Elections Clause, U.S. Term Limits, 514 U.S. at 805, 115 S.Ct. 1842, and states otherwise have no reserved authority over this domain, id., courts deciding issues raised under the Elections Clause need not strike any balance between competing sovereigns. Instead, the Elections Clause, as a standalone preemption provision, establishes its own balance, resolving all conflicts in favor of the federal government. See, e.g., Foster, 522 U.S. at 71, 118 S.Ct. 464 (stating that “the Constitution explicitly gives Congress the final say” on matters related to federal election procedures). For this reason, the “presumption against preemption” and “plain statement rule” that guide courts’ analysis of preemption under the Supremacy Clause are not transferable to the Elections Clause context. Cf. Gregory, 501 U.S. at 460-61, 111 S.Ct. 2395. Indeed, the Supreme Court has suggested as
*1175 much. In Foster, the Court upheld the Fifth Circuit’s determination that a state election law was voided by a federal election law; however, instead of adopting the Fifth Circuit’s Supremacy Clause analysis, the Supreme Court analyzed the claim under the Elections Clause, without ever mentioning any presumption against preemption or requirement of a plain statement of congressional intent to preempt. See Foster, 522 U.S. 67, 118 S.Ct. 464; Love v. Foster, 90 F.3d 1026 (5th Cir.1996), cert. granted in 522 U.S. 67, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997). In fact, our survey of Supreme Court opinions deciding issues under the Elections Clause reveals no case where the Court relied on or even discussed Supremacy Clause principles.
Because the Elections Clause empowered Congress to enact the NYRA, Wilson, 60 F.3d at 1414, the pre-emption analysis under that Clause is applicable here. We begin our analysis as the Court did in Foster, guided by Election Clause preemption principles. Accord Harkless v. Brunner, 545 F.3d 445, 454 (6th Cir. 2008) (declining to apply Supremacy Clause preemption principles in analyzing the preemptive effect of the NVRA).
B
The Supreme Court first explained the principles of Elections Clause preemption in Siebold, 100 U.S. 371. In that case, the Court likened the relationship between the laws passed by Congress and the state legislatures under the Elections Clause to “prior and subsequent enactments of the same legislature.” Id. at 384. “The State laws which Congress sees no occasion to alter, but which it allows to stand, are in effect adopted by Congress.” Id. at 388. By this token, just as a subsequent legislature is not required to make an “entirely new set” of laws when modifying those of a prior legislature, neither is Congress required to wholly take over the regulation of federal election procedures when choosing to “make or alter” certain of the states’ rules. Id. at 384. According to the Court, there is no “intrinsic difficulty in such cooperation” between the state and national legislatures because the two governments do not possess an “equality of jurisdiction” with respect to federal elections. Id. at 392. While Congress may override state enactments, the state may not vitiate an action'of Congress by adopting a system of regulations to undo congressional efforts. See id. at 393, 397. In all instances, “the laws of the State, in so far as they are inconsistent with the laws of Congress on the same subject, cease to have effect as laws.” Id. at 397.
Over a century later, the Supreme Court clarified what constitutes a conflict under the Elections Clause’s single system of federal election procedures. See Foster, 522 U.S. 67, 118 S.Ct. 464. Foster considered whether a congressional enactment superseded a Louisiana statute regulating the same federal election procedure. Id. at 68-69, 118 S.Ct. 464. Specifically, sections 1 and 7 of Title 7 of the U.S.Code established the date for federal congressional elections as the Tuesday after the first Monday in November. Id. at 69-70, 118 S.Ct. 464. A Louisiana statute established an open primary in October where state voters could elect the candidate who would fill the offices of United States Senator and Representative. Id. at 70, 118 S.Ct. 464. Only if the open primary failed to result in a majority candidate would a run off election between the top two candidates be held on Congress’s specified election day. Id. In response to a challenge by Louisiana voters, the Court unanimously held that the state and federal acts conflicted, and thus invalidated the Louisiana law. Id. at 74, 118 S.Ct. 464.
In concluding that Congress’s power to preclude the state statute was beyond argument, the Court rejected the state’s *1176 claim that its statute and the federal enactment could be construed harmoniously. Id. at 73, 118 S.Ct. 464. Louisiana asserted that “the open primary system concern[ed] only the ‘manner’ of electing federal officials, not the ‘time’ at which the elections will take place.” Id. at 72, 118 S.Ct. 464. The Court discarded this “attempt to draw this time-manner line” as “merely wordplay” and an “imaginative characterization” of the statutes. Id. at 72-73, 118 S.Ct. 464. Building upon the principles from Siebold, the Court declined to adopt a strained interpretation of the statutes to reconcile a potential disagreement. See id. Rather, the Court emphasized Congress’s unique plenary authority not only to supplant state rules but to conscript states to carry out federal enactments under the Elections Clause, and found it enough that, under a natural reading, the state and federal enactments addressed the same procedures and were in conflict. Id. (noting that the Louisiana’s regulation addressed the timing of elections “quite as obviously” as the federal one). Refusing to “par[e] [the statute] down to the definitional bone,” the Court held that the state enactment was void. Id. at 72, 74, 118 S.Ct. 464.
Reading Siebold and Foster together, we derive the following approach for considering whether federal enactments under the Elections Clause displace a state’s procedures for conducting federal elections. First, as suggested in Siebold, we consider the state and federal laws as if they comprise a single system of federal election procedures. Siebold, 100 U.S. at 384. If the state law complements the congressional procedural scheme, we treat it as if it were adopted by Congress as part of that scheme. See id. If Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature. Foster, 522 U.S. at 74,118 S.Ct. 464. With this approach in mind, we consider whether the NVRA and Proposition 200 operate harmoniously in a single procedural scheme for federal voter registration.
C
To resolve the question here, we must first understand both the federal and state voter registration procedures at issue. We earlier explained the changes to Arizona’s registration statutes under Proposition 200, which incorporated a requirement that registrants submit documentary proof of citizenship in order to register to vote. See supra Part I; Ariz.Rev.Stat. §§ 16-152, 16-166. Our next step is to examine the scope of the NVRA.
1
Congress enacted the NVRA because, among other reasons, it determined that “discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.” 42 U.S.C. § 1973gg(a).
Initially, Congress attempted to address this problem by enacting legislation that permitted the government and prospective voters to challenge discriminatory practices in the courts. See South Carolina v. Katzenbach, 383 U.S. 301, 313, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (discussing the Civil Rights Act of 1957, which “authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds,” and the Civil Rights Act of 1964, which “expedited the hearing of voting cases before three-judge courts and outlawed some of the tactics” used to disqualify African Americans from voting in federal elec *1177 tions).[10] The elimination of discriminatory voting practices through litigation, however, was “slow and expensive, and [meanwhile] the States were creative in contriving new rules to continue violating the Fifteenth [and Fourteenth] Amendments] in the face of adverse federal court decrees.” Nw. Austin. Mun. Utility Dis. No. One v. Holder (NAMUDNO), — U.S. -, 129 S.Ct. 2504, 2508-09, 174 L.Ed.2d 140 (2009) (internal quotation marks omitted). To limit voter registration, some local officials defied court edicts or “simply closed their registration offices to freeze the voting rolls.” Katzenbach, 383 U.S. at 314, 86 S.Ct. 803. Congress’s attempts to “authoriz[e] registration by federal officers ... had little impact on local maladministration.” Id. Nearly a century after the Civil War, registration of eligible African American voters in some states was still fifty percentage points lower than that of eligible white voters. Shaw v. Reno, 509 U.S. 630, 640, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).
Congress tried a different approach to addressing this problem by passing the Voting Rights Act of 1965 (VRA), Pub.L. No. 89-110, 79 Stat. 437(codified at 42 U.S.C. § 1973 et seq.). The VRA, enacted under the authority of Congress’s Fifteenth Amendment enforcement powers, is “a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant.” Katzenbach, 383 U.S. at 308, 315, 86 S.Ct. 803. As enacted, the VRA suspended the use of literacy tests, § 4(a)-(d), required covered jurisdictions to pre-clear changes in voting procedures and practices, § 5, and provided for the appointment of federal examiners to assist in registering qualified citizens to vote, §§ 6, 7, 9, 13. Section 2 of the VRA also permits actions to be brought to void voting qualifications or prerequisites “resulting in the denial or abridgement of the right of any citizen of the United States to vote on account or race or color.”
While considered on the whole to be a successful tool in eliminating the more obvious discriminatory voting procedures, see NAMUDNO, 129 S.Ct. at 2511, the VRA failed to address voter registration procedures, which imposed a “complicated maze of local laws and procedures, in some cases as restrictive as the out-lawed practices, through which eligible citizens had to navigate in order to exercise their right to vote,” H.R.Rep. No. 103-9, at 3 (1993), 1993 U.S.C.C.A.N. 105, 107. Between 1988 and 1993, Congress held a series of hearings focused on reforming the voter registration process to address the increasingly pressing issue of low voter turnout in federal elections. Condon v. Reno, 913 F.Supp. 946, 949 n. 2 (D.S.C.1995). Congress found that, while over eighty percent of registered citizens voted in Presidential elections, only sixty percent of eligible voters were registered. H.R.Rep. No. 103-9, at 3. Public opinion polls showed that the primary reason eligible citizens were not voting was the failure to register. Id. While acknowledging that this failure was attributable to many factors outside its control, Congress enacted the NVRA to address the problems within its control, namely those barriers to registration that were imposed by state governments. See id. Under the Elections Clause, Congress had the power “to provide a complete code for congressional elections, not only as to times and places, but in relation to ... registration.” Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932). Through this authority, Congress enacted the NVRA to remove these obstacles and “to provide *1178 simplified systems for registering to vote in federal elections.” Young v. Fordice, 520 U.S. 273, 275, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997) (emphasis omitted).
2
The NVRA is a comprehensive scheme enacting three significant changes to federal election registration procedures nationwide: (1) it creates a standard “Federal Form” (described below) for registering federal voters; (2) it requires states to establish procedures to register voters for federal elections according to three prescribed methods; and (3) it regulates maintenance of voting lists. See 42 U.S.C. § 1973gg et seq.
Section 1973gg, setting forth the act’s “Findings and Purposes,” provides an overview of the NVRA. The “findings” subsection, § 1973gg(a), articulates Congress’s intent to promote voter registration and to address “discriminatory and unfair registration laws.” The “purposes” subsection, § 1973gg(b), provides a preview of the operative sections of the NVRA, listing Congress’s goals of increasing voter registration and enhancing the participation of eligible votdrs (relating to Sections 2 through 5, § 1973gg-2- § 1973gg-5) and the goals of ensuring the accuracy of registration rolls and protecting the integrity of the electoral process (relating to Section 6, § 1973gg-6).
Section 2, § 1973gg-2, sets forth the scope and applicability of the act.[11] Each state (except for those that do not require voter registration as a prerequisite to voting) “shall establish procedures to register” voters for federal elections according to the NVRA’s three methods “notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law.” § 1973gg-2(a).
The first method of voter registration is described in Section 3, § 1973gg-3. This section provides that any application for a driver’s license submitted to a state motor vehicle authority “shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.” § 1973gg-3(a)(l). This provision earned the statute its informal title, the “Motor Voter Law.” United States v. Lam, 181 F.3d 183, 191 (1st Cir.1999). Under the statute, the voter registration form must be part of the driver’s license application, and generally “may not require any information that duplicates information required in the driver’s license portion of the form.” § 1973gg-3(c)(2)(A). Section 3 also limits the content of the form to the minimum necessary to prevent duplicate voter registrations and to enable the state to assess the eligibility of the applicant.[12]
The second method of voter registration, set forth in Section 4, § 1973gg-4, requires states to register federal voters by mail using the Federal Form. Section 4(a)(1) states that “[e]ach State shall accept and use the [Federal Form] for the registra *1179 tion of voters in elections for Federal office.” Section 4(a)(2) provides that, “[i]n addition to accepting and using [the Federal Form], a State may develop and use a mail voter registration form that meets all the criteria” of the Federal Form. Section 4(b) discusses the availability of the Federal Form and the state equivalent: States must make the mail registration form “available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.” § 1973gg-4(b). With certain exceptions not pertinent here, the statute permits states to require citizens who register by mail to vote in person if they have not previously voted in the jurisdiction. § 1973gg-4(c).
The third method of federal voter registration is mandated by Section 5, § 1973gg-5, which requires states to designate certain state offices for voter registration. Targeting “the poor and persons with disabilities who do not have driver’s licenses and will not come into contact with” motor vehicle agencies, H.R.Rep. No. 103-66, at 19 (1993), as reprinted in 1993 U.S.C.C.A.N. 140, 144, this section requires states to provide for federal registration at “all offices in the State that provide public assistance,” § 1973gg-5(a)(2)(A), and “all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities,” § 1973gg-5(a)(2)(B). The state may also designate additional government offices such as “public libraries, public schools, offices of
city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and [other offices] that provides services to persons with disabilities” as voter registration agencies. § 1973gg-5(a)(3).
Section 5 requires each designated agency to provide applicants with the Federal Form, help them complete it, and mandates “[a]cceptance of completed voter registration application forms for transmittal to the appropriate State election official.” § 1973gg-5(a)(4)(A). As in Section 4, the designated state agency may also distribute a state form, but only “if it is equivalent” to the Federal Form. § 1973gg-5(a)(6)(A)(ii).
Section 6, § 1973gg-6, establishes procedures to enhance the accuracy and integrity of the official voting lists both by removing ineligible voters and preventing the mistaken removal of eligible voters.
Section 7, § 1973gg-7, describes how the federal and state governments will determine the contents of the Federal Form, and otherwise coordinate administration of the NVRA’s procedures. This section delegates the creation of the Federal Form to the federal Election Assistance Commission (EAC).[13] § 1973gg-7(a). The section requires the EAC to work “in consultation with the chief election officers of the States” in crafting the Form’s contents. Id.
Section 7 also sets out parameters for what the Federal Form may, shall, and cannot include.[14] Among other things, the *1180 Federal Form “may require only such identifying information” as is necessary to allow the state to determine the eligibility of the applicant and to administer the voter registration and election process. § 1973gg-7(b)(l). The Federal Form must inform the applicant as to every eligibility requirement “including citizenship” and require the applicant to attest, under penalty of perjury, that the applicant meets each requirement. § 1973gg-7(b)(2). The form “may not include any requirement for notarization or other formal authentication.” § 1973gg-7(b)(3).
Section 8, § 1973gg-8, requires states to designate an officer to serve as chief election official. Section 9, § 1973gg-9, regulates civil enforcement of the NVRA’s provisions and designates a private right of action under the statute. Section 10, § 1973gg-10, sets forth the criminal penalties for election fraud or other non-compliance with the statute.
As this overview indicates, the thrust of the NVRA is to increase federal voter registration by streamlining the registration process. In this vein, the NVRA requires states to make registration opportunities widely available, at the motor vehicle bureau, § 1973gg-3, by mail, § 1973gg-4, and at public assistance, disability service, and other designated state offices, § 1973gg-5. Along with increasing the opportunities for registration, the NVRA eases the burdens of completing registration forms. At the motor vehicle authority, for instance, voter registration must be included as part of the driver’s license application and the combined form cannot require duplicative information. § 1973gg-3(e)(2)(A). The NVRA also regulates the Federal Form to meet its goal of eliminating obstacles to voter registration. See § 1973gg(b)(l)-(2). Thus, the NVRA forbids the EAC from including any identifying information beyond that “necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.” § 1973gg-7(b)(l). In sum, as every court to have considered the act has concluded, the NVRA’s central purpose is to increase voter registration by streamlining voter registration procedures. See, e.g., Hark-less, 545 F.3d at 449; Welker v. Clarke, 239 F.3d 596, 598-99 (3d Cir.2001) (“One of the NVRA’s central purposes was to dramatically expand opportunities for voter registration .... ”); Disabled in Action of Metro. N.Y. v. Hammons, 202 F.3d 110, 114 (2d Cir.2000); Lara, 181 F.3d at 192 (“The NVRA is addressed to heightening overall popular participation in federal elections.... ”); Nat’l Coal, for Students with Disabilities Educ. & Legal Def. Fund v. Allen, 152 F.3d 283, 285 (4th Cir.1998) (“Congress passed the NVRA ... to encourage increased voter registration for elections involving federal offices” and “to *1181 make it easier to register to vote.”); ACORN v. Miller, 129 F.3d 833, 835 (6th Cir.1997) (“In an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements, Congress passed the [NVRA].”).
3
Turning now to our Elections Clause analysis, we consider whether Proposition 200’s documentary proof of citizenship requirement is superseded by the NVRA. As indicated by the approach derived from Siebold and Foster, see supra Part II.B, we consider the state and federal enactments together as if they composed a single system of federal election procedures. Next, we consider whether, read naturally, the NVRA provisions complement Proposition 200’s voter registration requirements or supersede them. If a natural interpretation of the language of the two enactments leads to the conclusion that the state law does not function consistently and harmoniously with the overriding federal scheme, then it is replaced by the federal statute.
Applying this framework, we conclude that Proposition 200’s documentary proof of citizenship requirement conflicts with the NVRA’s text, structure, and purpose. First, the NVRA addresses precisely the same topic as Proposition 200 in greater specificity, namely, the information that will be required to ensure that an applicant is eligible to vote in federal elections. See Foster, 522 U.S. at 73, 118 S.Ct. 464. Section 7 of the NVRA, § 1973gg-7, both spells out the information that an applicant must provide in order to register to vote in a federal election and limits what the Federal Form can require. It “may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant.” § 1973gg-7(b)(1). The Federal Form accounts for eligibility concerns by requiring applicants to attest, under penalty of perjury, that they meet every eligibility requirement. § 1973gg-7(b)(2). Acknowledging the states’ interests in ensuring voter eligibility, Congress allowed states to give their input on the contents of the Federal Form in an advisory capacity to the EAC. § 1973gg-7(a)(2). Given the NVRA’s comprehensive regulation of the development of the Federal Form, there is no room for Arizona to impose sua sponte an additional identification requirement as a prerequisite to federal voter registration for registrants using that form. If viewed as a second enactment by the same legislature, the NVRA clearly subsumes Proposition 200’s additional documentary requirement on registrants using the Federal Form. See Siebold, 100 U.S. at 384.
Further supporting this conclusion, the value of the Federal Form (and hence a centerpiece of the NVRA) would be lost, and Congress’s goal to eliminate states’ discriminatory or onerous registration requirements vitiated, if we were to agree with Arizona that states could add any requirements they saw fit to registration for federal elections through the Federal Form. For instance, the NVRA prohibits the Federal Form from requiring notarization or other such formal authentication. § 1973gg-7(b)(3). If the NVRA did not supersede additional state requirements on registrants using the Federal Form, as Arizona asserts, then states would be free to impose a notarization requirement as a prerequisite to their “acceptance] and use” of the form, see § 1973gg-4(a)(l), even though such a requirement would directly contradict Congress’s intent in prohibiting such a requirement in the form itself.
*1182 Moreover, specific statutory language in the NVRA, when read in an unstrained and natural manner, is inconsistent with the state enactment. The NVRA mandates that states “shall accept and use” the Federal Form when applicants register by mail. § 1973gg~4(a). It likewise requires “acceptance” of the completed Federal Form at state office buildings, which must be transmitted to the appropriate State election officials. § 1973gg-5(a)(4)(iii). The state must implement these methods of registering voters, as well as the combined motor vehicle-voter registration form, § 1973gg-3(c)(l), “notwithstanding any other Federal or state law,” § 1973gg-2(a). By contrast, Proposition 200 precludes the state from registering applicants who have completed and submitted the Federal Form unless such applicants also mail in, or submit at the designated state office building, documentary proof of citizenship. Ariz.Rev.Stat. §§ 16-152, 16-166. Such a requirement falls under the umbrella of laws displaced by the NVRA’s “notwithstanding” language.
Structurally, allowing states to impose their own requirements for federal voter registration on registrants using the Federal Form would nullify the NVRA’s procedure for soliciting state input, and aggrandize the states’ role in direct contravention of the lines of authority prescribed by Section 7. The NVRA permits states to suggest changes to the Federal Form, but gives the EAC ultimate authority to adopt or reject those suggestions. § 1973gg-7(a). Here, for example, before enacting Proposition 200, Arizona petitioned the EAC to include a requirement in the Federal Form that the applicant present documentary proof of citizenship analogous to what is required by Proposition 200. Pursuant to the procedure set forth in the NVRA, the EAC denied the suggestion and warned that Arizona “may not refuse to register individuals to vote in a Federal election for failing to provide supplemental proof of citizenship, if they have properly completed and timely submitted the Federal Registration Form.” Faced with this denial, Arizona proceeded to implement the requirement in Proposition 200 as a separate state condition to voter registration, which was imposed even on those registering to vote in federal elections with the Federal Form. If the NVRA did not supersede state-imposed requirements for federal voter registration, this type of end-run around the EAC’s consultative process would become the norm, and Congress’s control over the requirements of federal registration would be crippled. Given that the Elections Clause gives Congress ultimate authority over the federal voter registration process, Colegrove, 328 U.S. at 554, 66 S.Ct. 1198, such a reading of the NVRA is untenable.
More broadly, Proposition 200 is not in harmony with the intent behind the NVRA, which is to reduce state-imposed obstacles to federal registration. It is indisputable that by requiring documentary proof of citizenship, Proposition 200 creates an additional state hurdle to registration. As indicated in our overview, supra Part C.2, the NVRA was sensitive to the multiple purposes of a federal voter registration scheme, including the need “to establish procedures that [would] increase the number of eligible citizens who register to vote in elections for Federal office” and the need to protect “the integrity of the electoral process.” § 1973gg(b). The balance struck by the EAC pursuant to § 1973gg-7(a) was to require applicants to attest to their citizenship under penalty of perjury, but not to require the presentation of documentary proof. Id. Proposition 200’s additional requirement is not consistent with this balance.
Arizona argues that Proposition 200 does not conflict with the NVRA because *1183 the NVRA nowhere expressly precludes states from imposing requirements in addition to those of the Federal Form. Focusing on the phrase in the NVRA Section 4 which requires states to “accept and use” the Federal Form to register mail applicants, see § 1973gg-4(a)(l), Arizona argues that its registration process complies with the NVRA because the state makes the Federal Form available to applicants, and will accept the Form so long as it is accompanied by documentary proof of citizenship.
Like the petitioners in Foster, Arizona has offered a creative interpretation of the state and federal statutes to avoid a direct conflict. See Foster, 522 U.S. at 72, 118 S.Ct. 464. But as Foster counsels, we do not strain to reconcile the state’s federal election regulations with those of Congress under the Elections Clause; rather, we consider whether the additional registration requirement mandated by Proposition 200 is harmonious with the procedures mandated by Congress under a natural reading of the statutes. See id. at 74, 118 S.Ct. 464; Siebold, 100 U.S. at 384. As explained above, allowing Arizona to impose Proposition 200’s registration provisions on top of the Federal Form conflicts with the NVRA’s purpose, procedural framework, and the specific requirement that states use the Federal Form or its equivalent, “notwithstanding any other state or federal law,” § 1973gg-2(a). Under Congress’s expansive Elections Clause power, we must hold Arizona’s documentary proof of citizenship requirement, Ariz. Rev.Stat. §§ 16-152(A)(23), 16-166(F), superseded by the NVRA.[15]
4
Arizona’s remaining arguments do not persuade us to reach a different conclusion. First, Arizona contends that an interpretation of the NVRA that precludes states from imposing additional voter registration requirements for federal elections is unreasonable because Congress could not have intended states to register “any and all” applicants who submit the Federal Form without any outlet for the states to check those applicants’ qualifications. Arizona asserts that because the act contemplates that some applications will be rejected, see § 1973gg-6(a)(2) (which requires states to notify “each applicant of the disposition of the application”), the NVRA cannot require states to automatically register every individual using the Federal Form.
This argument reflects a misunderstanding of the NVRA. As Section 6 demonstrates, states need not register every applicant who completes and submits the Federal Form. See § 1973gg-6(a)(2). Voters still have to prove their eligibility pursuant to the Federal Form. Contrary to Arizona’s assertion, the NVRA does not *1184 require states to register applicants who are ineligible, or whose forms are incomplete, inaccurate, or illegible.
Second, Arizona argues that states must have freedom to exercise their own methods for determining voter eligibility as a protection against voter fraud. In ACORN v. Edgar, the Seventh Circuit considered and discarded a similar argument. In that case, the state claimed that the “Motor Voter” component of the NVRA “opens the door to voter fraud.” 56 F.3d at 795. The court rejected the argument in part because “federal law contains a number of safeguards against vote fraud, and it is entirely conjectural that they are inferior to the protections that [state] law offers.” Id. at 795-96 (citation omitted).
We reach the same conclusion here. Congress was well aware of the problem of voter fraud when it passed the NVRA, as evidenced by the numerous fraud protections built into the act. For one, Section 10 applies federal criminal penalties to persons who knowingly and willingly engage in fraudulent registration tactics. § 1973gg-10(2). Second, Sections 3 and 7 require the Federal Form and the combined motor vehicle-voter registration form to contain an attestation clause that sets out the requirements for voter eligibility. §§ 1973gg-3(c)(2)(C)(i)-(ii), 1973gg-7(b)(2)(A)-(B). Applicants are required to sign these forms under penalty of perjury. §§ 1973gg-3(c)(2)(C)(iii), 1973gg-7(b)(2)(C). Third, Section 4 permits states to verify the eligibility and identity of voters by requiring first-time voters who register by mail to appear at the polling place in person, where the voter’s identity can be confirmed. § 1973gg-4(e). Last, Section 6 requires states to give notice to applicants of the disposition of their registration, which states may use as a means to detect fraudulent registrations. See § 1973gg-6(a)(2). Because Congress dealt with the issue of voter fraud in the NVRA, we are not persuaded by Arizona’s claim that states must be permitted to impose additional requirements to address the same issue.
Third, Arizona suggests that Congress’s enactment of HAVA, 42 U.S.C. § 15301 et seq., which Congress passed after the NVRA, provides a gloss on the NVRA’s meaning. According to Arizona, HAVA demonstrated Congress’s intent to permit states to ensure the eligibility of voter registrants, and made clear that states could exceed the minimum requirements of the NVRA in carrying out their registration functions.
We disagree. Congress enacted HAVA in reaction to the 2000 Presidential election and the ensuing controversial Florida recount. Fla. State Conference of NAACP v. Browning, 522 F.3d 1153, 1155 (11th Cir.2008). The NVRA and HAVA operate in separate spheres: while the NVRA regulates voter registration, HAVA is concerned with updating election technologies and other election-day issues at polling places.
As relevant here, HAVA interacts with the NVRA only on a few discrete issues. First, HAVA added two check-boxes to the Federal Form, requiring applicants to check off whether they are citizens of the United States and whether they are old enough to vote. 42 U.S.C. § 15483(b)(4).
Second, HAVA permits mail registrants who have not previously voted in a federal election to submit documents verifying their identity along with the Federal Form. § 15483(b)(3). First-time voters who take advantage of this provision do not have to show their identification when they arrive at the polling place, id., a step that the states may otherwise require under the NVRA, see § 1973gg-4(c). This option is not, however, a prerequisite to successful registration, as applicants who choose not to submit documentation may still be registered.
*1185 Third, HAVA requires states to assign each registrant a “unique identifier” capable of being cross-checked against voters’ identities at the polls. § 15483(a)(1)(A). HAVA provides that the unique identifier may be the applicant’s driver’s license number or the last four digits of the applicant’s social security number. See § 15483(a)(5)(A). But nothing in HAVA allows the state to require these forms of identification as a prerequisite to registration. Rather, if the applicant possesses neither a driver’s license nor social security card, HAVA requires the state to assign the applicant “a number which will serve to identify the applicant for voter registration purposes.” § 15483(a)(5)(A)(ii). The unique identifier is not used to check the citizenship of the registrant, but rather to ensure that the voter who appears at the polls is the same person who registered to vote.
Nor does HAVA allow states to exceed the voter registration requirements set forth in the NVRA. In making this argument, Arizona points to the provision in HAVA stating that:
The requirements established by this title are minimum requirements and nothing in this title shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements so long as such State requirements are not inconsistent with the Federal requirements under this sub-chapter or any law [including the NVRA and other federal voting regulations, § 15545].
§ 15484. But the “election technology and administration requirements” referenced in this section refer to HAVA’s requirements that states update election equipment (such as by replacing punch card voting systems) and meet other voting system standards. While § 15484 permits states to institute their own technological and administrative improvements, it does not allow them to impose additional requirements on the voter registration process established by the NVRA. Indeed, the section itself precludes states from adding requirements “inconsistent with the Federal requirements under” the NVRA. § 15484. Moreover, HAVA expressly provides that “nothing [in HAVA] may be construed to authorize or require conduct prohibited under [the NVRA].” § 15545(a)(4). This language indicates Congress’s intent was to prevent HAVA from interfering with NVRA’s comprehensive voter registration system. Accordingly, Arizona’s reliance on HAVA is unavailing.
D
Finally, Arizona argues that we are foreclosed from reviewing Gonzalez’s NVRA claim because the prior panel’s ruling in Gonzalez I, which occurred at the preliminary injunction phase of this case, already decided that the NVRA does not supersede the changes to Arizona’s registration system under Proposition 200. See Gonzalez I, 485 F.3d at 1050-51. Arizona asserts that this prior ruling is dispositive, and there is no ground for the court to reconsider the issue here.
Addressing this argument requires us to review the applicability of our law of the case doctrine.[16] Under this doctrine, “one panel of an appellate court *1186 will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case.” Hegler v. Borg, 50 F.3d 1472, 1475 (9th Cir.1995) (citation and internal quotation marks omitted). The doctrine applies to prior decisions based on pure issues of law, even those made, as here, in the preliminary-stages of review of the same case. See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep’t of Agric., 499 F.3d 1108, 1114 (9th Cir. 2007).
“The effect of the doctrine is not dispositive, particularly when a court is reconsidering its own judgment, for the law of the case ‘directs a court’s discretion, it does not limit the tribunal’s power.’ ” Mendenhall v. Nat’l Transp. Safety Bd., 213 F.3d 464, 469 (9th Cir.2000) (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). In other words, “there is nothing in the Constitution of the United States to require [invocation of the doctrine], or to prevent a [court] from allowing a past action to be modified while a case remains in court.” King v. West Virginia, 216 U.S. 92, 101, 30 S.Ct. 225, 54 L.Ed. 396 (1910). Instead, the doctrine’s utility is typically prudential: “it’s a courteous and efficient way for a court to say ‘enough’s enough’ when litigants seek reconsideration of prior interlocutory decisions.” Jeffries v. Wood (Jeffries V), 114 F.3d 1484, 1509 (9th Cir.1997) (en banc) (Kozinski, J., dissenting) (citing cases), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).
That said, the policies animating the law of the case doctrine are undeniably fundamental. The doctrine “promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues.” Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (internal quotation marks omitted). These are paramount concerns to sound judicial administration, as “[a]n appellate court cannot efficiently perform its duty to provide expeditious justice to all if a question once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal.” Kimball v. Callahan, 590 F.2d 768, 771 (9th Cir.1979) (internal quotation marks omitted).
Balanced against these valid concerns, however, are equally strong considerations that occasionally pull in the opposite direction. We have held that the “[l]aw of the case should not be applied woodenly in a way inconsistent with substantial justice.” United States v. Miller, 822 F.2d 828, 832 (9th Cir.1987); see also Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 602 (9th Cir.1991) (“[T]he law of the case is an equitable doctrine that should not be applied if it would be unfair.”); Loumar, Inc. v. Smith, 698 F.2d 759, 762 (5th Cir.1983) (“The law of the case doctrine is not ... a barrier to correction of judicial error. It is a rule of convenience and utility and yields to adequate reason.... ”). Interests of efficiency and finality clash with the responsibility of the court to not issue judgments known to be wrong on the facts or law.
As a compromise between these sometimes countervailing interests, we have identified three exceptional circumstances in which, on balance, we deem the concerns of finality and efficiency outweighed. Law of the case should not operate as a constraint on judicial review where “(1) the decision is clearly erroneous and its enforcement would work a manifest injustice,[17] (2) intervening controlling au *1187 thority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.” Jeffries V, 114 F.3d at 1489 (internal quotation marks and footnote omitted). Here, Gonzalez argues that the first exception applies. We agree.
The prior panel’s conclusion that the NVRA permits state-imposed documentary proof of citizenship requirements on registrants using the Federal Form was based on three provisions of the statute. First, the panel indicated that under the NVRA states must “either ‘accept and use the mail voter registration form prescribed by the Federal Election Commission’ or, in the alternative, ‘develop and use [their own] form,’ as long as the latter conforms to the federal guidelines.” Gonzalez I, 485 F.3d at 1050(second alteration in original) (citations omitted). Second, the panel asserted that the NVRA “prohibits states from requiring the form to be notarized or otherwise formally authenticated.” Id. Last, the panel described the NVRA as “permit[ting] states to ‘require[ ] such identifying information ... as is necessary to enable ... election officials] to assess the eligibility of the applicant.’ ” Id. (alterations in original). Construing these provisions together, the panel concluded that the statute plainly contemplates allowing states to require voters to present at least some evidence of citizenship at the time of registration. Id. at 1050-51.
As may be apparent from our NVRA analysis supra, the prior panel’s conclusion was rooted in a fundamental misreading of the statute. As the dissent acknowledges, see Dissent at 1204-05, the NVRA does not give states freedom “either” to accept and use the Federal Form “or, in the alternative,” develop their own form. See id. Rather, the NVRA commands without exception that states “shall” accept and use the Federal Form, and if they develop their own form, it can be used only “in addition to” accepting and using the Federal Form, and still must meet all of the criteria of Section 7. See § 1973gg-4(a). Thus, while Section 4 of the NVRA applies the limitations of Section 7(b) to the states with respect to the creation of their own state forms, nothing in the text or structure of either provision supports reading Section 7(b) as giving the states any authority over or discretion to modify the Federal Form. Insofar as the prior panel referred to portions of the NVRA that relate to the Federal Form, see Gonzalez I, 485 F.3d at 1050, those excerpts are directed solely at the EAC, not the states. See § 1973gg-7(a)-(b). These provisions cannot be said to “plainly allow states ... to require their citizens to present evidence of citizenship when registering to vote” for federal elections via the Federal Form. Id. at 1050-51.
The dissent takes issue with our analysis of the prior panel’s opinion, suggesting that the panel may have been using “either ... or, in the alternative” in a conjunctive sense. Dissent at 1203-05. We disagree. The prior panel’s statement that states can *1188 “either accept and use” the Federal Form “or, in the alternative ” develop and use their own form cannot reasonably be interpreted to mean that states can both accept and use the Federal Form and also develop and use their own form. Indeed, such an interpretation would be contrary to the prior panel’s logic; the prior panel based its conclusion that states could require registrants using the Federal Form to show additional identification on the ground that states could require use of their own forms in lieu of the Federal Form.
As another basis for upholding the prior panel’s opinion, the dissent suggests that the prior panel’s conclusion was correct although its reasoning was erroneous, because “accept and use” in § 1973gg-4(a)(l) can be read to mean “accept ... for a particular purpose [but] not have it be sufficient to satisfy that purpose.” Dissent at 1206. In other words, the dissent argues that although states are required to “accept and use” the Federal Form, the NVRA leaves them free to require prospective voters to comply with additional registration requirements beyond those mandated by the Federal Form. As noted above, Arizona makes a similar argument. This argument is inconsistent with the language and structure of the NVRA. The dissent’s strained interpretation would make the EAC’s procedure for consultation and development of the Federal Form under Section 7(a) an empty exercise, because any state could require registrants to comply with additional state requirements even if they register with the Federal Form. As discussed above, under an Elections Clause framework, we do not strain the language of the NVRA to render it harmonious with Proposition 200. In the context of the NVRA, “accept and use” can mean only one thing: the states must “accept and use” the Federal Form as a fully sufficient means of registering to vote in federal elections.
Reasoning from a fundamental misreading of the statute, the prior panel reached a conclusion that was clear error. See Jeffries V, 114 F.3d at 1489. The text, structure, and purpose of the NVRA simply cannot bear the prior panel’s interpretation. Moreover, this case represents an “exceptional circumstance,” where the effect of the erroneous decision, were it to stand, would result in a manifest injustice. Id. at 1489, 1492. Not only does the erroneous conclusion impede the implementation of a major congressional enactment, but it poses a significant inequity to citizens who are required under the state law to navigate obstacles that do not exist under federal law in pursuit of their fundamental right to vote. See id. at 1492 (stating that manifest injustice may be found where the challenged decision involves a “significant inequity”). Though we are sensitive to the cautious approach courts should take in deciding to alter an earlier panel’s decision, because the prior decision in this case not only reached a clearly erroneous result, but reached that result on the basis of a misconstruction of the statute, we are convinced that there are appropriately exceptional circumstances to review the decision here.
The fact that the prior panel’s decision was contained in a published opinion does not strip us of our discretion to review its conclusions, because no subsequent published decision has relied upon the prior panel’s decision for the proposition to be overturned. See, e.g., Mendenhall, 213 F.3d at 469 (reversing a prior published appellate opinion as clearly erroneous under the exceptions to the law of the case); Tahoe-Sierra, 216 F.3d at 786-87 (same). Under such circumstances, the law of the circuit doctrine does not preclude us from revising prior decisions in the same case under the established excep *1189 tions to the law of the case. See Jeffries V, 114 F.3d 1484.
This conclusion was made clear in Jeffries V, an en banc decision highlighting the workings of our law of the case doctrine. Although the procedural history of the Jeffries decisions is complex,[18] the central question addressed in Jeffries V was whether Jeffries IV, 75 F.3d 491, erred in its application of an exception to the law of the case. The Jeffries TV panel held that it could reverse its prior holding in Jeffries III, 5 F.3d 1180, under the first exception to the law of the case, because Jeffries III was “clearly erroneous and would work a manifest injustice.” Jeffries TV, 75 F.3d at 494. In Jeffries V, we rejected the state’s argument that we should avoid reaching the law of the case issue and instead decide the case on the merits, due to the importance of the law of the case doctrine to our jurisprudence. See 114 F.3d at 1492. After a careful review of the law of the case doctrine, we concluded in Jeffries V that the Jeffries TV panel had erred in overturning Jeffries III, because none of the exceptions to the law of the case were applicable. Id. at 1489. Focusing on the first exception, see id. at 1489 n. 2, we concluded that Jeffries III was not clearly erroneous, and would not work a manifest injustice, and accordingly Jeffries TV had erred in reversing it. Id. at 1489.
The decision in Jeffries V was also supported on stare decisis grounds. Noting that two Ninth Circuit panels had already relied on Jeffries III at the time Jeffries TV was decided, see Thompson v. Borg, 74 F.3d 1571, 1575 n. 1 (9th Cir.1996); Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995), we stated that a panel “must be exceedingly careful in altering the law of its earlier opinion” in circumstances “when subsequent panels have relied on the initial decision” because “[ojtherwise, intra-circuit conflict may arise, posing serious difficulties.” Jeffries V, 114 F.3d at 1492. Moreover, we noted that “to reach its decision properly, the Jeffries TV panel would have had to reverse Lawson,” which could not properly be done by a three-judge panel. Id. In explaining the effect of prior published opinions on the applicability of our exceptions to the law of the case, the en banc court in Jeffries V notably did not adopt the view of the dissent in that case that “no three-judge panel may reconsider a rule of law embodied in a prior published opinion,” even one in the same case, Jeffries V, 114 F.3d at 1511 (Kozinski, J., *1190 dissenting). In sum, under our en banc decision in Jeffries V, though a panel cannot overturn prior published opinions in different cases, it may overturn a prior published opinion in the same case if the exceptions to the law of the case are applicable.
In this case, no other panel of this court has relied upon the prior panel’s decision for the proposition that the NVRA does not supersede additional state requirements for federal voter registration. Where no subsequent opinion has relied on the prior published opinion for the proposition to be overturned, there is no stare decisis problem and consequently the law of the circuit doctrine does not prohibit revising the prior opinion.
Despite our decision in Jeffries V, the dissent argues that we are bound by a rule that we can never reverse a prior published opinion, even one in the same case. Dissent at 1198-99. On its face, this is the same rule that was proposed in the Jeffries V dissent and rejected by the majority. To overcome this obstacle, the dissent claims that a footnote in United States v. Washington (Washington IV), 593 F.3d 790 (9th Cir.2010) (en banc), overruled Jeffries V on this issue. Dissent at 1199.
We disagree. Washington IV was heard en banc to resolve an inconsistency between two conflicting lines of precedent on the question whether federal recognition of a tribe has a bearing on that tribe’s entitlement to fishing rights under a specific treaty. See 593 F.3d at 792-93, 798. In United States v. Washington (Washington III), 394 F.3d 1152 (9th Cir.2005), we held that the intervening federal recognition of a tribe “was a sufficient condition for the establishment of treaty fishing rights.” Id. at 1158. But in Greene v. United States (Cheene I), 996 F.2d 973, 976-77 (9th Cir.1993), and Greene v. Babbitt (Greene II), 64 F.3d 1266, 1270-71 (9th Cir.1995), we held that federal recognition of a tribe could have no effect on treaty fishing rights. On appeal from the district court’s decision following Washington III, we explained that “the conflict in our precedent led us to rehear the matter en banc without awaiting a three-judge decision.” Washington IV, 593 F.3d at 798 n. 9. This is correct: a three-judge panel could not have resolved the split between Washington III and Greene I and II. The footnote on which the dissent relies further explained that en banc review was necessary because, “[e]ven if the panel could have revisited Washington III under one of the exceptions to the law of the case, it still would have been bound by that published opinion as the law of the circuit ... ‘[W]e have no discretion to depart from precedential aspects of our prior decision ... under the general law-of-the-circuit rule.’ ” Washington IV, 593 F.3d at 798 n. 9 (citations omitted) (quoting Old Person v. Brown, 312 F.3d 1036, 1039 (9th Cir.2002)).
In light of the detailed discussion in Jeffries V regarding exceptions to the law of the case, we cannot read this sentence as overruling this longstanding doctrine. While Jeffries V was expressly decided on the law-of-the-ease ground, nothing in Washington IV turned on the law of the case doctrine. Nor did Washington IV expressly consider or overrule our en banc decision in Jeffries V. “In our circuit, statements made in passing, without analysis, are not binding precedent.” Thacker v. FCC (In re Magnacom Wireless, LLC), 503 F.3d 984, 993-94 (9th Cir.2007); see also United States v. Johnson, 256 F.3d 895, 915 (9th Cir.2001) (en banc) (Kozinski, J., concurring) (“Of course, not every statement of law in every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a pre *1191 lude to another legal issue that commands the panel’s full attention, it may be appropriate to re-visit the issue in a later case.”). The Washington IV footnote on which the dissent relies neither exhibits “reasoned consideration” of our law of the case doctrine, Johnson, 256 F.3d at 914, nor discusses an issue “germane,” id., to the resolution of Washington IV. In fact, it can more accurately be described as informational, “casual[,] and without analysis,” id. at 915. Moreover, the Washington IV footnote is silent on the question whether subsequent published opinions had relied on Washington III, which Jeffries V held could preclude an application of the exceptions to the law of the case. Jeffries V, 114 F.3d at 1489. Accordingly, we decline to hold that this footnote overruled sub silentio the reasoned analysis of the en banc court in Jeffries V[19]
Because, as set forth above, the prior panel’s decision on the NVRA issue meets the standard of a recognized law of the case exception, we have discretion to review that decision, and we have chosen to exercise that discretion here.
E
Perhaps the instructions to the Federal Form put it best in stating: “you can use the application in this booklet to: Register to vote in your State.” Under the NVRA, prospective voters seeking to register in federal elections need only complete and submit the Federal Form. If this sounds simple, it is by design. Congress enacted the NVRA to increase federal registration by streamlining the registration process and eliminating complicated state-imposed hurdles to registration, which it determined were driving down voter turnout rates. Proposition 200 imposes such a hurdle. In light of Congress’s paramount authority to “make or alter” state procedures for federal elections, see Foster, 522 U.S. at 69, 118 S.Ct. 464; Siebold, 100 U.S. at 371, we hold that the NVRA’s comprehensive regulation of federal election registration supersedes Arizona’s documentary proof of citizenship requirement, Ariz.Rev. Stat. §§ 16-152(A)(23), 16-166(F).
Because we hold Arizona’s registration requirement void under the NVRA, we need not reach Gonzalez’s claim that the documentary proof of citizenship requirement imposes greater burdens of registration on naturalized citizens than on non-naturalized citizens and burdens the fundamental right to vote in violation of the Fourteenth Amendment’s Equal Protection Clause.
Ill
The remainder of our analysis focuses solely on the validity of Arizona’s polling place provision, Ariz.Rev.Stat. § 16-579.[20] That statute requires voters to show proof of identification before voting at the polls. *1192 Id. We first consider Gonzalez’s appeal from the district court’s decision that Proposition 200 does not violate § 2 of the VRA, 42 U.S.C. § 1973.
A
Section 2(a) of the VRA prohibits states from imposing voting qualifications that result in the “denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 42 U.S.C. § 1973(a). A violation of § 2 is established “if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation” by members of a protected class “in that its members have less opportunity than other members of the electorate [1] to participate in the political process and [2] to elect representatives of their choice.” § 1973(b). Said otherwise, a plaintiff can prevail in a § 2 claim only if, “based on the totality of the circumstances, the challenged voting practice results in discrimination on account of race.”[21] Farrakhan v. Washington, 338 F.3d 1009, 1015 (9th Cir.2003); see also United States v. Blaine Cnty., Mont., 363 F.3d 897, 903 (9th Cir. 2004). A violation of § 2 does not require a showing of discriminatory intent, only discriminatory results. See Chisom v. Roemer, 501 U.S. 380, 383, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); Ruiz v. City of Santa Maria, 160 F.3d 543, 557 (9th Cir. 1998).
In applying the totality of the circumstances test, “a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors.” Thornburg v. Gingles, 478 U.S. 30, 44, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (internal quotation marks omitted). In conducting a § 2 analysis, courts are required to make a “searching inquiry” into “how the challenged [state] practice interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by” minorities in the electoral process. Farrakhan, 338 F.3d at 1016, 1020 (internal quotation marks omitted). In Gingles, the Supreme Court cited a non-exhaustive list of nine factors (generally referred to as the “Senate Factors” because they were discussed in the Senate Report on the 1982 amendments to the VRA) that courts should consider in making this totality of the circumstances assessment. 478 U.S. at 44-45, 106 S.Ct. 2752. Relevant here, the factors direct courts to consider the history of official state discrimination against the minority with respect to voting, the extent to which voting in the state is racially polarized, and “the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.” Id. at 36-37, 106 S.Ct. 2752(quoting S.Rep. No. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206-07). “[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.” Farrakhan v. Gregoire, 590 F.3d 989, 999 (9th Cir.2010) (internal quotation marks omitted).
Gonzalez alleges that Proposition 200’s registration and polling place identification requirements violate § 2 by disparately affecting Latino voters, unlawfully diluting their right to vote and providing them with less opportunity than other members of the electorate to participate in the political process. Considering statistical evidence *1193 on the existence of disparate impact on Latino registrants and voters, the district court determined that the limited statistical disparity between Latinos’ registration and voting as compared to the rest of the electorate was not statistically significant. Turning to the Senate Factors listed above, the district court found that Latinos had suffered a history of discrimination in Arizona that hindered their ability to participate in the political process fully, that there were socioeconomic disparities between Latinos and whites in Arizona, and that Arizona continues to have some degree of racially polarized voting.
Despite the presence of limited statistical disparity and some of the Senate Factors, however, the district court concluded that Gonzalez’s claim failed because there was no proof of a causal relationship between Proposition 200 and any alleged discriminatory impact on Latinos. The district court noted that not a single expert testified to a connection between the requirement that Latinos show identification under Proposition 200 and the observed difference in voter registration and voting rates of Latinos. Furthermore, the district court held that Gonzalez failed to explain how Proposition 200’s requirements interact with the social and historical climate of discrimination to impact Latino voting in Arizona. Without a causal link between the voting practice and prohibited discriminatory result, the district court concluded that Gonzalez had not proven that Proposition 200 results in discrimination “on account of race or color,” and that the claim must therefore be denied.
B
Because a § 2 analysis requires the district court to engage in a “searching practical evaluation of the past and present reality,” Gingles, 478 U.S. at 45, 106 S.Ct. 2752 (internal quotation marks omitted), a district court’s examination is “intensely fact-based and localized,” Salt River, 109 F.3d at 591. We therefore “[d]efer[] to the district court’s superior fact-finding capabilities,” id, and review for clear error the district court’s findings of fact, including its ultimate finding whether, under the totality of the circumstances, the challenged practice violates § 2, Old Person v. Cooney, 230 F.3d 1113, 1119(9th Cir.2000) (citing Gingles, 478 U.S. at 78-79, 106 S.Ct. 2752). We review de novo the district court’s legal determinations and mixed findings of law and fact. Salt River, 109 F.3d at 591. Again, because we have held that Proposition 200’s voter registration requirements are superseded by the NVRA, supra Part II, we consider only Proposition 200’s requirement that voters show identification at the polls, Ariz.Rev.Stat. § 16-579.
The district court did not clearly err in concluding that Gonzalez failed to establish that Proposition 200’s requirements caused any disparate impact on Latinos. To prevail under § 2, a plaintiff must prove “a causal connection between the challenged voting practice and a prohibited discriminatory result.” Salt River, 109 F.3d at 595 (alteration omitted). “[A] bare statistical showing of disproportionate impact on a racial minority does not satisfy the § 2 ‘results’ inquiry.” Id. at 595 (emphasis in original) (collecting cases). To prove that such a causal relationship exists, a plaintiff need not show that the challenged voting practice caused the disparate impact by itself. See Farrakhan, 338 F.3d at 1018-19. Rather, pursuant to a totality of the circumstances analysis, the plaintiff may prove causation by pointing to the interaction between the challenged practice and external factors such as surrounding racial discrimination, and by showing how that interaction results in the discriminatory impact. Id. at 1019. But even under this broad totality of the cir *1194 cumstances analysis, the causation requirement is crucial: a court may not enjoin a voting practice under § 2 unless there is evidence that the practice results in a denial or abridgement of the rights of a citizen on account of race or color. § 1973(a). If there is no evidence that the voting practice resulted in any such disparate impact, there is no violation and thus no basis for injunctive relief.
The district court correctly applied this standard here. The challenged practice at issue is Proposition 200’s requirement that voters show identification at the polls. To prove causation, Gonzalez had to establish that Proposition 200’s requirement that voters must produce forms of identification, as applied to Latinos, resulted in a prohibited discriminatory result. Here, Gonzalez alleged in his complaint that “Latinos, among other ethnic groups, are less likely to possess the forms of identification required under Proposition 200 to ... cast a ballot,” but produced no evidence supporting this allegation. The record does include evidence of Arizona’s general history of discrimination against Latinos and the existence of racially polarized voting. But Gonzalez adduced no evidence that Latinos’ ability or inability to obtain or possess identification for voting purposes (whether or not interacting with the history of discrimination and racially polarized voting) resulted in Latinos having less opportunity to participate in the political process and to elect representatives of their choice. Without such evidence, we cannot say that the district court’s finding that Gonzalez failed to prove causation was clearly erroneous. Therefore we affirm the district court’s denial of this claim.[22]
IV
Gonzalez I, which considered Gonzalez and ITCA’s appeal from the district court’s denial of a preliminary injunction, concluded that Arizona’s registration identification requirement was not a poll tax. See 485 F.3d at 1049. We held that the registration requirement did not (1) force voters “to choose between paying a poll tax and providing proof of citizenship when they register to vote,” the standard set forth in Harman v. Forssenius, 380 U.S. 528, 541-42, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); and did not (2) “make[] the affluence of the voter or payment of any fee an electoral standard,” as was held impermissible under the Fourteenth Amendment in Harper v. Virginia State Board of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Gonzalez I, 485 F.3d at 1049 (internal quotation marks omitted) (brackets in original).
Here, Gonzalez and ITCA argue that Proposition 200 imposes an unconstitutional poll tax in violation of the Twenty-fourth Amendment. Separately, ITCA asserts that Proposition 200 is also a poll tax under the Fourteenth Amendment. Guided by the analysis in Gonzalez I, we conclude that Proposition 200’s polling place identification requirement is not a poll tax under either constitutional provision.
A
The Twenty-fourth Amendment provides that:
The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative *1195 in Congress, shall not be denied or abridged by the United States for or any State by reason of failure to pay any poll tax or other tax.
U.S. Const, amend. XXIV.
Gonzalez does not argue that requiring voters to show identification at the polls is itself a poll tax. Rather, Gonzalez argues that, because some voters do not possess the identification required under Proposition 200, those voters will be required to spend money to obtain the requisite documentation, and that this payment is indirectly equivalent to a tax on the right to vote.
This analysis is incorrect. Although obtaining identification required under Arizona’s statute may have a cost, it is neither a poll tax itself (it is not a fee imposed on voters as a prerequisite for voting), nor is it a burden imposed on voters who refuse to pay a poll tax. Cf. Harman, 380 U.S. at 541-42, 85 S.Ct. 1177.
Our conclusion is consistent with Harman, the only Supreme Court case considering the Twenty-fourth Amendment’s ban on poll taxes. In that case, the Court considered a state statute that required voters to either pay a $1.50 poll tax on an annual basis or go through “a plainly cumbersome procedure,” id. at 541, 85 S.Ct. 1177, for filing an annual certificate of residence. Id. at 530-32, 85 S.Ct. 1177. There was no dispute that the $1.50 fee was a poll tax barred by the Twenty-Fourth Amendment. See id. at 540, 85 S.Ct. 1177. Accordingly, the only question before the Court was whether the state “may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence.” Id. at 538, 85 S.Ct. 1177. The Court enunciated the rule that a state may not impose “a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax.” Id. at 542, 85 S.Ct. 1177. Applying this rule, the Court determined that the state’s certificate of residence requirement was a material burden: among other things, the procedure for filing the certificate was unclear, the requirement that the certificate be filed six months before the election “perpetuat[ed] one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate,” and the state had other alternatives to establish that voters were residents, including “registration, use of criminal sanctionfs], purging of registration lists, [and] challenges and oaths.” Id. at 541-43, 85 S.Ct. 1177. Accordingly, the Court concluded that “[w]e are thus constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgment of his right to vote by reason of failure to pay the poll tax.” Id. at 542, 85 S.Ct. 1177.
Arizona’s polling place requirement is not analogous. Proposition 200’s requirement that voters identify themselves at the polling place is not a poll tax, as stated in Gonzalez I. 485 F.3d at 1049. Voters have only to verify their eligibility by showing identification at the polls,[23] which does not constitute a tax, a point which Gonzalez does not dispute. Nor does Proposition 200’s identification requirement place a material burden on voters “solely because of their refusal to waive the constitutional immunity” to a poll tax. Harman, 380 U.S. at 542, 85 S.Ct. 1177. Voters are not *1196 given the choice between paying a poll tax or obtaining identification; all voters are required to present identification at the polling place. See Gonzalez I, 485 F.3d at 1049. Cf. Harman, 380 U.S. at 541-42, 85 S.Ct. 1177. Because “Arizona’s system does not, as a matter of law, qualify as a poll tax,” the district court was correct in concluding that Proposition 200’s requirement of identification at the polling place did not violate the Twenty-fourth Amendment. See Gonzalez I, 485 F.3d at 1049.
B
Nor is Proposition 200’s requirement that voters show identification at the polling place a poll tax under the Fourteenth Amendment’s Equal Protection Clause.[24] Harper is the leading Supreme Court case considering whether a state law is a poll tax under the Equal Protection Clause. In Harper, the Supreme Court held that a state law levying an annual $1.50 poll tax on individuals exercising their right to vote in the state was unconstitutional under the Equal Protection Clause. Id. at 665-66 & n. 1, 86 S.Ct. 1079. The Court held that “the interest of the State, when it comes to voting, is limited to the power to fix qualifications,” id. at 668, 86 S.Ct. 1079, and that the imposition of poll taxes fell outside this power because “[w]ealth, like race, creed, or color, is not germane to one’s ability to participate intelligently in the electoral process,” id. Because the state’s poll tax made affluence of the voter an electoral standard, and such a standard is irrelevant to permissible voter qualifications, the Court concluded that the tax was invidiously discriminatory and a per se violation of the Equal Protection Clause. Id. at 666-67, 86 S.Ct. 1079.
Arizona’s polling place identification requirement falls outside of Harper’s rule that “restrictions on the right to vote are invidious if they are unrelated to voter qualifications.” Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 1616, 170 L.Ed.2d 574 (2008) (plurality opinion). The requirement that individuals show documents proving their identity is not an invidious classification based on impermissible standards of wealth or affluence, even if some individuals have to pay for them. On the contrary, requiring individuals to show identification falls squarely within the state’s power to fix core voter qualifications. Photo identification addresses the most basic voter criterion: that individuals seeking to cast a ballot are who they purport to be and are in fact eligible to vote. Even ITCA admits that this is a valid state interest.
ITCA argues that the Court’s more recent decision in Crawford, 553 U.S. 181, 128 S.Ct. 1610,[25] extended Harper’s holding to include a prohibition on indirect fees, such as fees or costs necessary to *1197 obtain required identification documents. ITCA seeks the benefit of Harper’s per se rule that such an electoral standard is invidiously discriminatory, and thus violates the Equal Protection Clause.
This argument is not consistent with Crawford. Crawford involved an Indiana state requirement that a citizen voting in person or at the office of the circuit court clerk before election day present a photo identification card issued by the government. Id. at 1613. The state would provide a free photo identification to “qualified voters able to establish their residence and identity.” Id. at 1614. A number of plaintiffs challenged this requirement on the ground that the “new law substantially burdens the right to vote in violation of the Fourteenth Amendment.” Id.
Although the Court was unable to agree on the rationale for upholding Indiana’s photo identification requirement,[26] neither the lead opinion nor the concurrence held that Harper’s per se rule applied to Indiana’s photo identification requirement. See id. at 1624. The lead opinion, upon which ITCA relies, explained that Harper’s “litmus test” made “even rational restrictions on the right to vote ... invidious if they are unrelated to voter qualifications.” Id. at 1616. But according to the lead opinion, later election cases had moved away from Harper to apply a balancing test to state-imposed burdens on the voting process. Id. Under these later cases, a court “must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the ‘hard judgment’ that our adversary system demands.” Id. The lead opinion then proceeded to apply this balancing test to the Indiana photo identification requirement. Id. Crawford did not purport to overrule Harper, however, which remains as an example of an electoral standard for which a state would never have sufficiently weighty interests to justify the requirement that a fee be paid in order to vote. Id. Because Crawford did not extend Harper’s per se rule to other burdens imposed on voters, but left it applicable only to poll tax requirements, Crawford does not support ITCA’s argument that Proposition 200’s identification requirement is per se invalid under Harper.
Although ITCA’s reliance on Crawford is not entirely clear, ITCA does not appear to argue that Proposition 200’s identification requirement is invalid under Crawford’s balancing test. ITCA does not, for example, claim that the burden imposed by the photo identification requirement was impermissibly heavy in light of Arizona’s legitimate interests. Such an argument would be unavailing in any event. The lead opinion in Crawford held that the burden imposed on citizens who must obtain a photo identification document was not sufficiently heavy to support a facial attack on the constitutionality of the state law, in light of the state’s legitimate interests in deterring and detecting voter fraud, modernizing election procedures, and safeguarding voter confidence. Id. at 1617, 1623. The same reasoning is applicable here. While the lead opinion noted that photo identification cards were provided free by Indiana, the lead opinion also recognized that to obtain Indiana’s free photo identification cards, individuals were required to “present at least one ‘primary’ document, which can be a birth certificate, certificate of naturalization, U.S. veterans photo identification, U.S. military photo identification, or a U.S. passport.” Id. at 1621 n. 17. Obtaining these primary documents, the Supreme Court acknowledged, *1198 may require payment of a fee. Id. Because Proposition 200 identification requirements include these same sorts of primary documents, Proposition 200’s requirements are no more burdensome than those upheld by Crawford. ITCA does not argue that Arizona’s interests in imposing a photo identification requirement are any less weighty than Indiana’s interests in deterring and detecting voter fraud, modernizing election procedures, and safeguarding voter confidence. Therefore, even under the balancing test set forth in the Crawford lead opinion, we would uphold Proposition 200’s polling place identification requirement against a facial challenge.
In sum, because any payment associated with obtaining the documents required under Proposition 200’s photo identification provision is related to the state’s legitimate interest in assessing the eligibility and qualifications of voters, the photo identification requirement is not an invidious restriction under Harper, and the burden is minimal under Crawford. As such, Arizona’s polling place photo identification requirement does not violate the Fourteenth Amendment’s Equal Protection Clause.
V
Our system of dual sovereignty, which gives the state and federal governments the authority to operate within their separate spheres, “is one of the Constitution’s structural protections of liberty.” Printz v. United States, 521 U.S. 898, 921, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). “Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.” Id. (quoting Gregory, 501 U.S. at 458, 111 S.Ct. 2395). Despite our respect for the state’s exercise of its sovereign authority, however, the Constitution’s text requires us to enforce the specific enumerated powers that are bestowed on the federal government and denied to the states. The authority granted to Congress under the Elections Clause to “make or alter” state law regulating procedures for federal elections is one such power. The Framers of the Constitution were clear that the states’ authority to regulate extends only so far as Congress declines to intervene. U.S. Const, art. 1, § 4, cl. 1; e.g., Foster, 522 U.S. at 69, 118 S.Ct. 464. Given the paramount authority delegated to Congress by the Elections Clause, we conclude that the NVRA, which implemented a comprehensive national system for registering federal voters, supersedes Arizona’s conflicting voter registration requirement for federal elections. We uphold Arizona’s polling place identification requirement with respect to all other claims.[27]
AFFIRMED in part and REVERSED in part.

.Section 16-166(F) provides the following list of approved identification documents:
1. The number of the applicant’s driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant’s driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.
2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.
3. A legible photocopy of pertinent pages of the applicant’s United States passport identifying the applicant and the applicant’s passport number or presentation to the county recorder of the applicant’s United States passport.
4. A presentation to the county recorder of the applicant’s United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.
5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.
6. The applicant’s Bureau of Indian Affairs card number, tribal treaty card number or tribal enrollment number.

.As of 2009, section 16 — 579(A)(1) provides:
(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appears to be the same as the name and address of the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification. Identification is deemed valid unless it can be determined on its face that it has expired.
(b) Two different items that contain the name and address of the elector that reasonably appears to be the same as the name and address in the precinct register, including a utility bill, a bank or credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state or local government issued identification or any mailing that is “official election material.” Identification is deemed valid unless it can be determined on its face that it has expired.
(c)A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States Military identification card or a valid United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

. ITCA's action was joined by the League of Women Voters of Arizona, the League of United Latin American Citizens, the Arizona Advocacy Network, and People For the American Way Foundation, as well as the claimants listed above.

. We refer to named plaintiffs Gonzalez and ITCA as representing all plaintiffs associated in their respective actions. Where appropriate, we refer to Gonzalez and ITCA individually; however, because Gonzalez and ITCA bring the same NVRA and Twenty-fourth Amendment claims, we refer to both collectively as "Gonzalez” in the sections discussing these two claims. We refer to the defendants collectively as “Arizona,” even though Arizona county recorders were also named as defendants in these consolidated actions.

. See Articles of Confederation of 1781, art. V ("[Delegates shall be annually appointed in such manner as the legislature of each state shall direct ... with a power, reserved to each state, to recall its delegates.... Each state shall maintain its own delegates in a meeting of the states....”).

. See 1 The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787 Together with the Journal of the Federal Convention, Luther Martin’s Letter, Yates’s Minutes, Congressional Opinions, Virginia & Kentucky Resolutions of '98-'99, and Other Illustrations of the Constitution 225 (photo, reprint 1987) (Jonathan Elliot ed., 2d ed.1901) [hereinafter Elliot’s Debates],

. South Carolinian delegates Charles Pinckney and John Rutledge moved to exclude the language giving Congress this supervisory power over the states. 5 Elliot’s Debates at 401. "The states, they contended, could and must be relied on” to regulate legislative appointments. Id. See also Vieth v. Jubelirer, 541 U.S. 267, 275-76, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004).

.Alexander Hamilton described the need for congressional oversight of the states as follows: "[The Framers] have submitted the regulation of elections for the federal government, in the first instance, to the local administrations; which, in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory; but they have reserved to the national authority a right to interpose, whenever extraordinary circumstances might render that interposition necessary to its safety.” The Federalist No. 59.

. The Court has generally construed Congress’s exclusive authority under the Elections Clause expansively. See, e.g., United States v. Gradwell, 243 U.S. 476, 483, 37 S.Ct. 407, 61 L.Ed. 857 (1917) (authority over federal election process, from registration to certification of results); United States v. Mosley, 238 U.S. 383, 386, 35 S.Ct. 904, 59 L.Ed. 1355 (1915) (authority to enforce the right of an eligible voter to cast ballot and have ballot counted); Ex Parte Coy, 127 U.S. 731, 752-53, 8 S.Ct. 1263, 32 L.Ed. 274 (1888) (authority to regulate conduct at any election coinciding with federal contest); Ex parte Yarbrough (The Ku-Klux Cases), 110 U.S. 651, 662, 4 S.Ct. 152, 28 L.Ed. 274 (1884) (authority to make additional laws for free, pure, and safe exercise of right to vote); Ex parte Clarke, 100 U.S. 399, 404, 25 L.Ed. 715 (1879) (authority to punish state election officers for violation of state duties vis-a-vis Congressional elections).

. Neither of these Acts were passed under the substantive authority of the Elections Clause, and therefore the Elections Clause analysis is not applicable to cases considering these enactments.

. Section 1 of the NVRA defines terms used in the statute. § 1973gg-l.

. Section 1973gg-3(c) provides, in pertinent part:
The combined motor vehicle-voter registration form:
(B) may require only tire minimum amount of information necessary to — •
(i)prevent duplicative voter registrations; and
do enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;
(C) shall include a statement that—
(i) states each eligibility requirement (including citizenship)
(ii) contains an attestation that the applicant meets each such requirement; and
(iii) requires the signature of the applicant under penalty of perjury[.]

. The responsibilities of the EAC were formerly held by the Federal Election Commission (FEC). When Congress passed the Help America Vote Act (HAVA), Pub.L. No. 107-252, 116 Stat. 1666, in 2002, it created the EAC, 42 U.S.C. § 15321, which eventually absorbed the FEC’s duties under the NVRA.

. The Federal Form:
(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process; *1180 (2) shall include a statement that—
(A) specifies each eligibility requirement (including citizenship);
(B) contains an attestation that the applicant meets each such requirement; and
(C) requires the signature of the applicant, under penalty of perjury;
(3) may not include any requirement for notarization or other formal authentication; and
(4) shall include, in print that is identical to that used in the attestation portion of the application'—
(i) [voter eligibility requirements and penalties for false applications, § 1973gg-6(a)(5)]
(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and
(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.
§ 1973gg-7(b).

. Because we reach our conclusion based on the language and structure of the statute, we do not rely on the EAC's interpretation of the NVRA or the NVRA's legislative history. Because the parties argue the import of these sources, we merely note that both are consistent with our holding. As discussed supra page 1182, the EAC construes the NVRA as not permitting states to “condition acceptance of the Federal Form upon receipt of additional proof.” With respect to legislative history, the NVRA's Conference Report, which we have held is the most authoritative and reliable legislative material, see, e.g., Nw. Forest Res. Council v. Glickman, 82 F.3d 825, 835 (9th Cir.1996), shows that Congress rejected an amendment to the NVRA which would have provided that “nothing in this Act shall prevent a State from requiring presentation of documentation relating to citizenship of an applicant for voter registration," H.R.Rep. No. 103-66, at 23 (1993), 1993 U.S.C.C.A.N. 140, 148. The conferees explained that the amendment was not "consistent with the purposes of” the NVRA and "could effectively eliminate, or seriously interfere with, the mail registration program of the Act.” Id.

. Law of the case is part of a related set of preclusion principles that includes stare decisis, res judicata, and collateral estoppel. 3 James Wm. Moore et al., Moore's Manual: Federal Practice & Procedure, § 30.01. Though linked by the general animating purpose of judicial efficiency, these principles are distinguished by the type or stage of litigation in which they separately apply, and as a consequence each has its own policy considerations. Id.

. As has been noted in prior cases, "[f]or some time, there have existed in the Ninth Circuit two different formulations of the set of *1187 circumstances in which a court may decline to follow the law of the case. The first formulation ... states that a court may depart from the law of the case if ‘the previous decision is clearly erroneous and its enforcement would work a manifest injustice.’ In contrast, the second formulation states that a court may decline to follow the law of the case if 'the first decision was clearly erroneous' or 'a manifest injustice would otherwise result.’ ” Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg. Planning Agency, 216 F.3d 764, 787 n. 43 (9th Cir.2000) (citations and brackets omitted), affd on other grounds, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); see also Mendenhall, 213 F.3d at 469 & n. 2. As in the other cases noting but not resolving this apparent conflict, we need not settle this issue in the present case, because there are grounds to satisfy the exception under either formulation of the standard.

. The Jeffries decisions were a series of five opinions in response to a habeas petition by Patrick Jeffries. Jeffries had been sentenced to death by a jury, but petitioned for relief on the ground of juror misconduct (he claimed that one juror had informed other jurors that Jeffries was a convicted armed robber). The district court rejected this claim on the ground that even if true, this fact would not have affected the verdict. On appeal, a panel of this court initially upheld the district court’s conclusion, Jeffries v. Blodgett (Jeffries I), 974 F.2d 1179 (9th Cir. 1992), but then granted Jeffries's petition for rehearing and reversed itself on the ground that Jeffries I conflicted with precedent. Jeffries v. Blodgett (Jeffries II), 988 F.2d 923 (9th Cir. 1993). The panel then rejected the state’s petition for rehearing, but amended Jeffries II to make clear that the claim of juror misconduct, if true, would have had a “substantial and injurious effect” on the verdict. Jeffries v. Blodgett (Jeffries III), 5 F.3d 1180 (9th Cir. 1993). On remand, the district court held that juror misconduct had in fact occurred and granted Jeffries's petition. See Jeffries V, 114 F.3d at 1488. After the state appealed this ruling, the panel again reversed itself, holding that it had interpreted precedent too broadly in Jeffries III, and that the law of the case did not prevent reversal of Jeffries III because that decision was "clearly erroneous and would work a manifest injustice.” See Jeffries v. Wood (Jeffries IV), 75 F.3d 491 (9th Cir. 1996). Accordingly, the panel reinstated its denial of Jeffries’s habeas petition. Jeffries petitioned for rehearing en banc, which we granted to determine, among other things, whether Jeffries IV had erred in reversing Jeffries III. See Jeffries V, 114 F.3d at 1488.

. The other cases cited by the dissent in support of its version of the law of the circuit doctrine were decided by three-judge panels and thus could not have overruled Jeffries V. See Minidoka Irrigation Dist. v. Dep’t of Interior, 406 F.3d 567 (9th Cir.2005); Old Person, 312 F.3d 1036; Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir.1996). One of these cases also predated Jeffries. See Hilao, 103 F.3d 767.

. Because Congress's authority under the Elections Clause is limited to preempting regulations related to federal elections, our holding invalidating Proposition 200’s registration requirement does not prevent Arizona from applying its requirement in state election registrations. However, Arizona has presented its system of voter registration under Proposition 200 as concurrently registering voters for state and federal elections, and has not indicated that, in the event Gonzalez prevails on the NVRA claim, it plans to establish a separate state registration system. We therefore do not consider whether Proposition 200’s registration requirement, as applied only to state registrations, is valid under Gonzalez and ITCA's remaining claims.

. This approach applies both to claims of vote denial and of vote dilution. Smith v. Salt River Project Agric. Improvement & Power Dist., 109 F.3d 586, 596 n. 8 (9th Cir. 1997).

. Gonzalez also argues that the district court erred in evaluating one of the Senate Factors and in concluding that the disparate impact on Latinos was statistically insignificant. Because Gonzalez’s failure to show causation is dispositive, however, we need not reach these issues.

. Voters who use an early ballot to vote do not even have to show identification. Ariz. Rev.Stat. § 16-550(A)(for early ballots, elector identity is verified by signature comparison alone).

. ITCA’s briefing collapses the Twenty-fourth Amendment and Fourteenth Amendment poll tax claims into a single argument. But these are different claims that arise under different constitutional amendments. The Twenty-fourth Amendment extends only to federal elections, see Harman, 380 U.S. at 540, 85 S.Ct. 1177 (holding that "the Twenty-fourth Amendment abolish[ed] the poll tax as a requirement for voting in federal elections”), while the Fourteenth Amendment also invalidates restrictions on the right to vote in state elections, see Harper, 383 U.S. at 666, 86 S.Ct. 1079. Therefore, we have addressed these claims separately.

. Crawford was decided by the Supreme Court after this court's holding in Gonzalez I. ITCA frames Crawford as an "intervening controlling authority” that provides a basis for this court to reconsider its decision in Gonzalez I that Arizona’s registration requirement is not a poll tax. Because Gonzalez I did not address whether the polling place identification requirement constituted a poll tax, see 485 F.3d at 1048-49, we need not address this argument.

. The lead opinion authored by Justice Stevens was joined by Chief Justice Roberts and Justice Kennedy. Justice Scalia filed a concurring opinion joined by Justices Thomas and Alito. The other three justices dissented.

. Each party will bear its own costs on appeal.