Chief Judge KOZINSKI,
concurring:
I find this a difficult and perplexing case. The statutory language we must apply is readily susceptible to the interpretation of the majority, but also that of the dissent. For a state to “accept and use” the federal form could mean that it must employ the form as a complete registration package, to the exclusion of other materials. This would construe the phrase “accept and use” narrowly or exclusively. But if we were to give the phrase a broad or inclusive construction, states could “accept and use” the federal form while also requiring registrants to provide documentation confirming what’s in the form. This wouldn’t render the federal form superfluous, just as redundant braking systems on cars and secondary power supplies on computers aren’t superfluous. This is known colloquially as wearing a belt and suspen *440 ders, and is widely used to safeguard against failure of critical systems (i.e., getting caught with your pants down). See Redundancy (engineering), Wikipedia, http://goo.gl/ce8il (last visited Jan. 9, 2012).
The two constructions embody different, and somewhat antithetical, policies. The narrow construction maximizes federal control and national uniformity at the expense of state autonomy and local control. The broad construction defers to state and local interests while sacrificing national uniformity. As a linguistic matter, neither construction of “accept and use” strikes me as superior.
If Congress had made it clear that states must accept the federal form as a complete application, or that they need not, I would cheerfully enforce either command. But Congress used tantalizingly vague language, which would make it very useful to fall back on a rule of construction, such as the Clear Statement Rule or the Presumption Against Preemption. Judge Ikuta is right, however, that the Supreme Court has so far adopted such rules only for Supremacy Clause cases, not for those arising under the Elections Clause. See maj. op. at 391-93.
There would, I believe, be ample justification for adopting such rules for Elections Clause preemption. While the federal government has an interest in how elections for federal office are conducted, the states are not disinterested bystanders. Federal elections determine who will represent the state and its citizens in Congress, the White House and, indirectly, the federal courts. Making sure that those representatives are chosen by the state’s qualified electors is of vital significance to the state and its people. Moreover, the federal government is commandeering the state’s resources, giving states a significant stake in ensuring that the process is conducted efficiently and fairly. Rightly or wrongly, many still blame (or credit) voting irregularities in Illinois for John F. Kennedy’s election as President in 1960, and in Texas for Lyndon Johnson’s election to the Senate in 1948. States have an interest in ensuring that their reputations aren’t soiled in this fashion for decades, maybe longer. The risk of fraud and other malfeasance may depend on local conditions and thus differ from state to state. States with a tradition of electoral chicanery, or with large transient populations, may need to impose stricter controls to ensure the integrity of their voting processes.
The fact remains that the Supreme Court has never articulated any doctrine giving deference to the states under the Elections Clause. This may be because it hasn’t had occasion to do so in modern times. Foster v. Love, 522 U.S. 67, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997), was an easy case where the state’s election scheme directly contradicted the constitutional text, while the state’s interest in avoiding a general election on the same day as the rest of the country was slight. A case such as ours, where the statutory language is unclear and the state has a compelling interest in avoiding fraudulent voting by large numbers of unqualified electors, presents a far more suitable case for deciding whether we should defer to state interests. But only the Supreme Court can adopt such a doctrine.
In the absence of something better, I must resort to secondary aids to construction. In this case, we have legislative history that supports reading “accept and use” in the exclusive sense, which would preclude states from seeking additional documentation. Senator Simpson proposed amending the bill that eventually became the NVRA to provide that “[n]othing in this Act shall be construed to preclude a State from requiring presentation of documentary evidence of the citizenship of an applicant for voter registration.” 139 Cong. Rec. 5098 (Mar. 16, 1993). He *441 explained his purpose: “It allows States to check documents to verify citizenship.... [I]t simply makes clear that this bill must not be interpreted to stop any particular State from requiring documents. This includes States which currently by State law check documents, as well as those who may wish to check documents in the future .... I offer my amendment to try to ensure that States will continue to have the right, if they wish, to require documents verifying citizenship.... ” Id. at 5098-99. Senator Simpson understood that “accept and use” could be read narrowly to preclude states from seeking documentation beyond the federal form, and offered his amendment to ensure that the phrase would be construed in the broad, inclusive sense.
Senator Ford, the NVRA’s sponsor, responded: “[T]here is nothing in the bill now that would preclude the State’s requiring presentation of documentary evidence of citizenship. I think basically this is redundant, even though you probably put it in a section. But there is nothing in there now that would preclude it.” Id. at 5099. Senator Ford seemed to believe that “accept and use” was already being used in the inclusive sense, and was amenable to adding language that would confirm this.
The Senate adopted the Simpson amendment, but the House bill lacked a similar provision. The Conference Committee adopted the House version, explaining that “[t]he conferees agree with the House bill and do not include this provision from the Senate amendment. It is not necessary or consistent with the purposes of this Act. Furthermore, there is concern that it could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act. It could also adversely affect the administration of the other registration programs as well.... These concerns lead the conferees to conclude that this section should be deleted.” H.R.Rep. No. 103-66, at 23-24 (1993), reprinted in 1993 U.S.C.C.A.N. 140,148-49 (Conf.Rep.). The conferees thus rejected the Simpson amendment, not because they thought it superfluous (as did Senator Ford) but because the inclusive meaning of “accept and use” was inconsistent with their vision of how the Act should operate.
After the conference, the Senate re-passed the NVRA without the Simpson amendment. S.Rep. No. 103-6, at 12-13 (1993). A minority of senators opposed the bill in part because they thought “requiring proof of citizenship” would be helpful in combating fraud and worried that the bill “would preclude such corrective action.” Id. at 50.
In the House, some members sought to recommit the bill in order to tack on a Simpson-like amendment. They argued that failure to do so would encourage voter fraud. See 139 Cong. Rec. at 9228 (May 5, 1993) (Rep. Livingson: “Without this provision, this bill is an auto-fraudo bill.”); id. at 9229 (Rep. Cox: “Despite its benign name, this pernicious bill would make it nearly impossible to prevent ineligible people — including illegal aliens — from voting.”). Their arguments fell on deaf ears. Id. at 9231.
The Supreme Court has warned us time and again not to rely on legislative history in interpreting statutes, largely because of the ease with which floor statements and committee reports can be manipulated to create a false impression as to what the body as a whole meant. But the history here consists of actions taken by legislative bodies, not just words penned by staffers or lobbyists. The Court has recognized that such drafting history can offer interpretive insight: “Congress’ rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government’s interpretation.” Hamdan v. Rumsfeld, 548 U.S. 557, 579-80, 126 S.Ct. 2749, 165 L.Ed.2d 723'(2006). While the dissenting Justices in Hamdan objected to the use of *442 legislative history, their objection rested in large part on the fact that it was being used to defeat clear statutory language. See id. at 665-68, 126 S.Ct. 2749 (Scalia, J., dissenting, joined by Thomas and Alito, JJ.). I’m not convinced they would object with equal vigor where, as here, the statutory language is in equipoise and both chambers affirmatively rejected efforts to authorize precisely what Arizona is seeking to do.
The dissent mistakenly sees some inconsistency between my conclusion today and that in my “well-drafted dissent to the original panel opinion.” Dissent at 450 n.l. But, as a member of a three-judge panel, I had no occasion to construe the statute de novo because we were bound by the law of the circuit and the law of the case. Gonzalez v. Arizona, 624 F.3d 1162, 1198-99 (9th Cir.2010) (Kozinski, C.J., dissenting in large part). To the extent I could reach the issue at all, it was only to determine whether “Gonzalez I is clearly wrong.” Id. at 1208. Because I concluded then, as I do now, that “both preemptive and non-preemptive constructions of ‘accept’ and ‘use’ are plausible,” I deferred to the earlier panel’s construction. Id. at 1206. As an en banc court, we cannot defer to Gonzalez I. Rather, we must come up with what we think is the best construction of the statute. For the reasons outlined above, and those in Judge Ikuta’s very fine and thorough opinion, I believe the preemptive reading of the statute is somewhat better than the alternative.